## 17261

MRS. FRANCES ADAMS, Respondent, v. DAVISON-PAXON COMPANY, Appellant
(96 S. E. (2d) 566)

*Messrs. Whaley & McCutchen* and *Hoover C. Blanton,* of Columbia, *for Appellant,*

534

*Messrs. McLeod & Singletary* and *John I. Rice,* of Columbia, *for Respondent,*

*Messrs. Whaley & McCutchen* and *Hoover C. Blanton*, of Columbia, *for Appellant*,

February 13, 1957.

STUKES, Chief Justice.

Respondent recovered judgment against appellant in tort for negligence in the maintenance of the basement stairway of its building. The evidence developed that she was an employee of Emporium World Millinery Company which operated that department of appellant's department store in Columbia. There are several grounds of appeal but the sustention of the ground which will be discussed requires reversal of the judgment and the other grounds need not be considered. It is that respondent is confined to her remedy under the Workmen's Compensation Act, particularly Section 72-111 of the Code of 1952, which follows:

"When any person, in this section and §§ 72-113 and 72-114 referred to as 'owner', undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 72-113 to 72-116 referred to as 'subcontractor') for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Title which he would have been liable to pay if the workman had been immediately employed by him."

As indicated, appellant operates a general retail department store which includes departments of men's and ladies' ready-to-wear, shoes, hats, etc., but its ladies' hat department, on the second floor, is operated through the agency of Emporium, based upon a contract which arose in the following manner.

Emporium was already operating the millinery department in appellant's Atlanta store and after negotiations relating to a similar operation in the Columbia store, Emporium addressed a letter, dated August 21, 1947, to appellant in Atlanta, which the latter formally accepted and agreed to the terms of it, as follows:

"Following telephone discussion betweent your Mr. Frank J. O'Gara and our Mr. J. Altman, this letter is to set out the arrangements for millinery operations in your store at Columbia, South Carolina, as follows:

"A—The Davison-Paxon Company (hereinafter referred to as the Store) agrees to the operation of the millinery department by the Emporium World Millinery Company (hereinafter referred to as the Millinery Company) in its store at Columbia, South Carolina;

"B—Commission on sales—Effective July 14, 1947, the Millinery Company will pay to the Store eighteen percent (18%) of the net sales made in said millinery department to and including October 31, 1947, and beginning November 1, 1947, the commission shall be twenty-four percent (24%) of the net sales in said millinery department.

"C—Terms of contract—It is understood that this agreement shall continue to December 31, 1950, subject to automatic extension to December 31, 1952, unless cancelled by the Store by notice in writing sixty days prior to December 31, 1950, such cancellation is then to be effective December 31, 1950.

"D—The floor location, area, etc., for selling space, workroom, office and stockroom are to be as arranged by the store;

"It is understood that the operating condition of the agreement between the Millinery Company and the Store in the Columbia, South Carolina location, including window space provision, fixture depreciation provision, and all other operating arrangements not specifically otherwise mentioned herein, shall be under the same general provisions, and run current with the other arrangements in effect between the Millinery Company and the Stores at Atlanta, Georgia; Macon, Georgia, and Augusta, Georgia."

The agreement in respect to the Atlanta store, to which the foregoing letter makes reference, was also admitted in evidence, with irrelevant omissions. The material portions of it follow, appellant being the "party of the first part" and Emporium the "party of the second part:"

"(a) It is understood and agreed that the party of the second part shall use the space above described for a work room, designing room, and for the sale of millinery and kindred lines of women and misses, which kindred lines shall include millinery trimmings and accessories, and it is understood that the party of the second part shall have the exclusive right to sell millinery and said kindred lines for women and misses in the aforementioned building; provided, however, that the party of the first part shall have the right to sell hats and caps for children.

"(b) The party of the first part agrees, at its own cost and expense, to furnish the necessary light, gas, power, heat, cashier and porter service for all of said space, including light for display cases and fixtures, elevator service, charge and sales books, address cards, sign writing service, stationery, wrapping paper and twine, toilet facilities, and water for ordinary uses in said described space, and delivery service for all merchandise sold by the party of the second part in said building. All necessary fixtures and carpets in the premises shall be kept in condition comparable to the rest of the building by the party of the first part.

"(c) The party of the second part agrees to carry at all times during the tenancy under this agreement a first class

stock of millnery and to sell the same at as low prices as the lowest prices prevailing for equal quality merchandise in the City of Atlanta, and to maintain a one-price system as is maintained throughout the rest of the store. Party of the first part shall have the right, from time to time, to examine and criticise and recommend to the party of the second part, based on the judgment of the store executives of the party of the first part, any improvements or changes which in their opinion should be made in the stock of merchandise carried in this department. In other words, the operation of this department shall be under the direct supervision of the staff executives of the party of the first part just as any other department in the store owned and operated by the party of the first part receives such supervision.

"(d) It is further agreed by and between the parties hereto that the party of the second part will pay, during each year of this lease, to the party of the first part. * * * dollars per annum in twenty-four equal installments on the first and fifteenth days of each month, as heretofore. In addition thereto, the party of the second part shall also pay to the party of the first part the difference between said guaranteed rental of * * * dollars a year and twenty-three per cent of the actual sales made in said department during the period from December 1, 1940, to November 30, 1941, and in the second year of said lease, that is, from December 1, 1941 to November 30, 1942, shall pay, in addition to said guaranteed annual rental of * * * dollars the difference between said guaranteed rental and twenty-four per cent of the actual sales made in said department. These payments in excess of said guaranteed rental of * * * dollars annually shall be made by the party of the second part four times each year, that is, at the end of February, May, August and November.

"(e) It is further agreed that settlement for sales made in said department shall be made on Thursday of each and every week for the sales of the previous week ending on Saturday, and the party of the first part will pay to the party

of the second part on said day the amount of said sales less the rent above stated, on the basis of * * * dollars per annum, and any money advanced by the party of the first part during the week preceding and less any money advanced by the party of the first part to the party of the second part and then unpaid. It is understood and agreed that the party of the first part will consider items of sales which have been charged to the customer and items which have been sent out C.O.D. as cash, and shall include the same in the weekly settlement; however, adjustments of claims on goods returned to the store on which the customer is allowed a refund shall be allowed as a credit to the party of the first part. In case the amount due by the party of the first part to the party of the second part is not equal to the amount of rent accrued due by the party of the second part to the party of the first part, as herein otherwise provided, then the balance of such rent shall be carried forward into future settlements. Settlement for 23% or 24% of the actual sales shall be made as previously described, four times each year.

"The party of the second part shall pay the following expenses in addition to the other obligations hereinbefore expressed, to wit:

"(a) Salaries of all employees employed by the party of the second part in and about the business to be conducted in said Millinery Department.

"(b) All premiums for fire insurance on all merchandise and fixtures in said building owned by the party of the second part and Workmen's Compensation and Public Liability insurances, Social Security and any and all other taxes that may be imposed from time to time by City, State or Federal Government similar to that which is carried by and applies to the balance of the store.

"(c) Said party of the second part will pay for advertising ordered by it from the party of the first part at the same rates paid by the party of the first part, provided such rates can be obtained for it. There shall be included in the cost of such advertising the *pro rata* cost of the general

headings and footings of the advertisements in which the party of the second part has agreed to take space and as well the cost of the space which is devoted to exclusive advertising of said millinery department.

"(d) The full amount of the personal property tax and all other taxes which may be directly or indirectly levied against said millinery department to be conducted by the party of the second part and the sales made therein, and if any such taxes shall not be specifically and directly levied against said millinery department and sales made, then the party of the second part shall pay such percentage of said taxes as the value of its property located in said building, shall hear to the total amount of property located in said building, it being understood and agreed that the party of the second part shall not be required to pay any portion of any taxes levied against the said building or any corporation taxes levied against the party of the first part.

"(e) Said party of the second part shall pay for all boxes and bags used by it in the conduct of its business.

"5. The party of the second part shall use no other name in connection with advertising said millinery department, nor in dealing with the public in connection therewith, nor with the customers thereof, nor in making sales therefor, than that of the party of the first part. All sales shall be made in the name of the party of the first part and all accounts shall be made out in the name of the party of the first part, and all bills to customers shall be rendered by party of the first part, but the said party of the second part shall in no event have the right to pledge the credit of the party of the first part in any way whatsoever and this covenant shall not constitute a contract of partnership.

"6. The party of the second part hereby agrees that its employees will hereby conform to the rules established from time to time by the party of the first part and further agrees that it will not employ nor continue in its employ any person or persons reasonably objectionable to the party of the first part.

"7. It is further agreed that the business of the party of the second part to be conducted in said millinery department shall be conducted to all intents and purposes as though it were a part of the business of said party of the first part insofar as the same deals with the customers as to refunds, exchanges, complaints or adjustments, the decision of the party of the first part shall be binding and final.

"8. In the event the building in which this business is located is substantially destroyed by fire, earthquake or other extraordinary cause so that the whole or substantially the whole thereof is rendered untenantable for mercantile purposes, this contract shall be at an end except for the purpose of accounting thereunder. In case of partial destruction of the said building which does not affect the operation of the millinery department the rent shall not be affected or abate in any wise, and in case of the partial destruction of said building so that a part of the premises hereby leased for millinery purposes becomes untenantable, then the rent shall abate in proportion to that part of the premises which are untenantable."

Under date of August 13, 1949, Emporium wrote appellant at Atlanta to the effect that the agreement between them for the operation of the millinery departments in the various stores, including Columbia, should continue until December 31, 1954, and from year to year thereafter subject to cancellation on that date or any subsequent December 31st upon sixty days' prior notice. At the foot of the letter the terms of it were agreed to in writing by appellant. Thus the foregoing agreement was in force at the time that respondent was injured.

It is noted that there are differences in the agreements relating to the Atlanta and Columbia stores of appellant. The Atlanta agreement referred to the occupancy by Emporium as a tenancy and a guaranteed annual rental in addition to a percentage of sales was provided for, which terms are not in the agreement relative to the Columbia store. The latter does not refer to a tenancy, lease, minimum rental, or

rental arrangement, as did the Atlanta agreement; the Columbia store receives only a percentage of the net sales in the millinery department. No specified space was designated in the Columbia store as in the Atlanta store and the size, location, etc., of the millinery department in the Columbia store were determined by appellant. The latter negatives a lease of space.

Emporium's Columbia manager was employed by it and her salary was paid direct to her by Emporium. However, respondent, who was a saleslady in Emporium's millinery department, was employed subject to the approval of appellant's store manager and she was paid her salary by appellant, and the latter was reimbursed by Emporium. She appeared to the public, and she considered herself, to be an employee of appellant and after her injury, through her attorney, she filed notice with the Industrial Commission of her claim for workmen's compensation as an employee of appellant. Upon subsequently commencing this action at law for damages she requested that the claim for compensation be held in abeyance pending the result of the action.

The millinery department, where respondent was employed as a saleslady, was in a portion of the store which was designated by appellant's store manager and without prior agreement as to its location. It was not separated by partition or otherwise from the other departments of the store, but was as other departments, one contiguous to the others. The proceeds of cash sales of millinery were paid to the cashier of the store and, in accord with the contract, credit sales were billed to customers by appellant and in its name, along with goods sold from the other departments. Appellant absorbed the losses on uncollectible accounts for millinery, as with other sales on credit. Publicly Emporium's name appeared nowhere. Even the hats were labeled with appellant's name, Davison's, except some which bore the manufacturer's name; and the boxes in which they were delivered were labeled "Davison's." The whole public conduct of the business was in the name of Davison's, in-

cluding advertising and window displays. On occasions, such as Easter, millinery was displayed in other, presumably more advantageous, parts of the store. There was evidence, and it may be said to be within common knowledge, that millinery is an essential and integral part of a women's ready-to-wear store; that will hardly be gainsaid. The millinery employees were allowed discounts on personal purchases in the other departments, and vice versa.

It has been consistently held that whether the claim of an injured workman is within the jurisdiction of the Industrial Commission is a matter of law for decision by the court, which includes the finding of the facts which relate to jurisdiction. *Knight v. Shepherd,* 191 S. C. 452, 4 S. E. (2d) 906; *Tedars v. Savannah River Veneer Company,* 202 S. C. 363, 25 S. E. (2d) 235, 147 A. L. R. 914; *McDowell v. Stilley Plywood Co.,* 210 S. C. 173, 41 S. E. (2d) 872; *Miles v. West Virginia Pulp & Paper Co.,* 212 S. C. 424, 48 S. E. (2d) 26; *Watson v. Wannamaker & Wells, Inc.,* 212 S. C. 506, 48 S. E. (2d) 447; *Gordon v. Hollywood-Beaufort Package Corp.,* 213 S. C. 438, 49 S. E. (2d) 718; *Holland v. Georgia Hardwood Lbr. Co.,* 214 S. C. 195, 51 S. E. (2d) 744; *Younginer v. J. A. Jones Const. Co.,* 215 S. C. 135, 54 S. E. (2d) 545; *Horton v. Baruch,* 217 S. C. 48, 59 S. E. (2d) 545.

Thus the trial court should have in this case resolved the conflicts in the evidence and determined the fact of whether Emporium was performing a part of the "trade, business or occupation" of the department store-appellant and, therefore, whether respondent's remedy is exclusively under the Workmen's Compensation Law. This was included in appellant's grounds for directed verdict; upon consideration of the evidence we are constrained to hold that it was error to refuse the motion to direct the verdict in favor of appellant. Suppose the respective positions of the parties were reversed and respondent were claiming workmen's compensation perforce the provisions of Sec. 72-111 and appellant opposing the claim. It can scarcely be

doubted that the claim would be upheld under the facts. And if there were doubt, the scales would be tipped in favor of the claimant by the considerations stated in the following excerpt from the opinion in *Yeomans v. Anheuser-Busch, Inc.*, 198 S. C. 65, 72, 15 S. E. (2d) 833, 835, 136 A. L. R. 894: "It was also said in the last mentioned decision of this Court, the *Ham Case, Ham v. Mullins Lumber Co.*, [193 S. C. 66, 7 S. E. (2d) 712], that the basic purpose of the Compensation Act is the inclusion of employers and employees, and not their exclusion; and we add that doubts of jurisdiction must be resolved in favor of inclusion rather than exclusion."

If respondent's construction of the facts were followed to logical end, appellant might operate all of its many departments in the same manner as it does its millinery department, and it would not be in the department store business at all, which seems to us a *reductio ad absurdum*. If that situation should result, the manifest purpose of Sec. 72-111 might be thwarted. Plainly, the legislature did not so intend.

Our first and leading case upon the construction and application of the subject statute is *Marchbanks v. Duke Power Co.*, 190 S. C. 336, 2 S. E. (2d) 825, where the workman-plaintiff, who was the employee of an independent contractor (referred to in the statute as "subcontractor"), was engaged in painting poles of the defendant power company. The exhaustive and well-reasoned circuit court order of Judge Oxner (now and long a justice of this court) was affirmed and published as a part of the judgment on appeal. It was held that plaintiff's exclusive remedy was for workmen's compensation under the provisions of the statute, and his action at law was dismissed for the reason that the work in which he was engaged was a part of defendant's business because it was in maintenance of its poles, by means of which, and the attached wires, it distributed electricity. (Under the evidence in the case at bar appellant's millinery department was just as much a part of its department store business, which it contracted with Emporium to operate.)

It was pointed out that the purpose of the statute is to extend the benefits of workmen's compensation to workmen who otherwise would not be entitled to them. It is a protection of the employees of irresponsible contractors who do not provide workmen's compensation coverage for their employees, and prevents employers from escaping liability by doing through independent contractors what they would otherwise do through their own employees.

In the case in hand it appears that appellant and Emporium operated within the coverage of the compensation law; but that of Emporium must have been voluntary because they had only three employees in appellant's store. Secs. 72-107 (2) and 72-109. Except for this voluntary assumption by Emporium of liability under the act and except for the effect of Sec. 72-111, plaintiff would be without the protection of workmen's compensation. For it she gave up the right to proceed at common law in an action for damages. As has been said by many courts in many decisions, if an employer is within the act to bear its liabilities, he must remain to be accorded its immunities, in the absence of a clearly expressed legislative intention to the contrary. In the instant case, and in others similar appellant is entitled to workmen's compensation without burden upon her to prove actionable negligence on the part of the owner or its contractor, and is immune from the usual defenses in employee against employer actions at law.

We are not called upon in this appeal to decide whether she should proceed against appellant or against Emporium, or both, for the compensation benefits. to which the facts appear to entitle her. Here we only decide that she is not entitled to maintain this action at law. Sec. 72-121 so limits her remedy.

The *Marchbanks case* has been followed in subsequent decisions. *Boseman v. Pacific Mills,* 193 S. C. 479, 8 S. E. (2d) 878, involved the deaths of two employees of an independent contractor who had contracted to paint the water tank of a textile mill. Although the mill always contracted

for this specialized work and never did it by its own employees, it was held that it was an integral part of the business of the mill and that the dependents of the deceased workmen were entitled to payment by the mill of workmen's compensation benefits. *Smith v. Fulmer,* 198 S. C. 91, 15 S. E. (2d) 681, was decided on like principles and it was said that the subcontractor simply stepped into the shoes of the principal contractor (or owner). *Kennerly v. Ocmulgee Lumber Co.,* 206 S. C. 481, 34 S. E. (2d) 792, was concerned with the death of an employee of a contractor-logger to a lumber mill which was subject to the workmen's compensation law. The logging, although accomplished through the agency of an independent contractor, was held to be within the statute as a part of the business of the mill. Of similar facts and the same result was *Hopkins v. Darlington Veneer Co.,* 208 S. C. 307, 38 S. E. (2d) 4. Compare *Miles v. West Virginia Pulp & Paper Co., supra,* 212 S. C. 424, 48 S. E. (2d) 26, where a wood "producer", dealing with a "dealer" of the defendant was denied compensation upon his claim against the latter; it was not contended that the presently controlling statute was applicable to the facts of that case. In *Benbow v. Edmunds High School,* 220 S. C. 363, 67 S. E. (2d) 680, Sec. 72-111 was held not to include a workman who was injured while engaged in minor electrical repairs in a school building, upon the ground that he was a casual employee; and it was unnecessary to determine whether the work was a part of the trade, business or occupation of the school.

The able and conscientious trial judge was influenced in his decision by *Stratis v. McLellan Stores Co.,* 311 Mass. 525, 42 N. E. (2d) 282, 142 A. L. R. 1393, upon which respondent likewise relies. While the result of that case is in conflict with that which we have reached, there are factual differences, chief of which is that the plaintiff was the employee of a concessionaire which operated a luncheonette and soda fountain in the department store—defendant. We think it obvious that the sale of millinery is more a part of

the trade, business and occupation (the words of the statute) of a department store such as appellant, than is the sale of food and soft drinks at a lunch counter. This is not to say that the latter may not be such, but surely millinery is more clearly so. Moreover, the section of the Massachusetts compensation law which corresponds with our Sec. 72-111 contains a qualification which ours does not, as follows: "This section shall not apply to any contract of an independent or sub-contractor which is merely ancillary and incidental to, and is no part of or process in, the trade or business carried on by the insured [owner]." G. L. (Ter. Ed.) c. 152, § 18.

*Levy's Ladies Toggery, Inc., v. Bryant,* 1946, 183 Tenn. 372, 192 S. W. (2d) 883, presented the same problem as the case *sub judice,* although it involved the assessment of unemployment compensation taxes. On the third floor of Levy's department store one Hiller operated a boys' ready-to-wear shop under a contract between him and Levy of very similar terms to the contract in this case. The applicable statute closely corresponds with our Sec. 72-111. It follows: "Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work which is part of its usual trade, occupation, profession, or business, * * * the employing unit shall for all the purposes of this chapter be deemed to employ each individual in the employ of each contractor or subcontractor * * *." Code, § 6901.-19(e). The court held that the relation of Levy's and Hiller fell within the statute, which coincides with our conclusion here. *Stratis v. McLellan Stores Co., supra,* was discussed by the court and it was indicated that it would have resulted oppositely under the law of Tennessee, for which there was cited *Adams v. Hercules Powder Co.,* 1943, 180 Tenn. 340, 175 S. W. (2d) 319, 151 A. L. R. 1352.

In the last cited, *Levy's case,* there was cited *Union Dry Goods Co. v. Cook,* 1944, 71 Ga. App. 708, 32 S. E. (2d) 190, which was also an unemployment compensation case, but the applicable statute was quite similar to that here in-

volved. It provided, that quoting, "Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work, which is part of its usual trade, occupation, profession, or business * * * the employing unit shall * * * be deemed to employ each individual in the employ of each such contractor or subcontractor * * *." Laws 1937, p. 841. The facts were also similar to the facts presented here. A large Macon department store, with twenty or more departments, had always operated its shoe department and its beauty shop through the agency of others, under an agreement called a lease, which is set out in full in the report of the case. Reading of it shows that the lessees were more nearly independent than is Emporium in this case. Nevertheless, the court concluded that the effect of the statute was to make these departments of the store parts of it, just as here the effect of our similar statute is to make the employees of Emporium the statutory employees of appellant.

The *Levy case* was reaffirmed and followed in J. *Goldsmith & Sons Co. v. Hake,* 1948, 187 Tenn. 88, 213 S. W. (2d) 15, in the case of a department store which had "leased out" three of its departments—paint and wallpaper, oriental rugs and optometry. The contracts were similar in terms and effect to those in the *Levy case* and to that here.

*Unemployment Compensation Comm. v. L. Harvey & Son Co.,* 1947, 227 N. C. 291, 42 S. E. (2d) 86, is a similar case, involving an identical statute to that of Georgia, G. S. § 96-8(e). The defendant department store "leased out" its shoe department for a fixed percentage of sales and under other conditions comparable to those here. It was held that the shoe department was part of the store for the purposes of the statute, and its employees the statutory employees of the store.

Unemployment compensation cases of contrary result to those which we have cited are referred to in the order of the lower court refusing judgment n. o. v. or new trial in this case. One is *Grand Leader Department Store, Inc., v.*

*Department of Labor,* 1953, 415 Ill. 110, 112 N. E. (2d) 461. The plaintiff was aptly referred to as a *"so-called* department store" because it had leased out all of its departments. The case is further distinguished because at the time it arose Illinois had no comparable statute to that which governs here and which governed the other unemployment compensation cases which we have cited. The court remarked upon the repeal of it in 1945. The other *contra* case cited by the trial court is *George J. Wolff Co. v. Commissioner of Unemployment Compensation, etc.,* 1945, 24 Wash. (2d) 62, 163 P. (2d) 179, 164 A. L. R. 1403. There the court distinguished the *Union Dry Goods case* and the *Levy's Ladies Toggery case,* both *supra,* upon what the court considered to be important differences in the contracts between the department stores in those cases and the contract immediately before the court. It was not held that the cited cases were wrong on their facts, but that they were not in point; and the contract in the case at bar more nearly resembles the contracts in the *Union Dry Goods* and *Levy's cases* than it does the contract in the *Wolff case.* It would unduly prolong this opinion to point out the contrasting provisions of the several contracts.

Unemployment compensation cases which pose the question at issue here have been cited because they involve statutory provisions similar to our Sec. 72-111. The latter is subject to the rule of liberal construction of the compensation law to include employments within it, whereas the unemployment compensation statutes impose taxes, which ordinarily calls for strict construction to exclude subjects. This, if anything, would add weight to the authority of the unemployment compensation cases which we have cited, wherein employees of subcontractors were held to be included perforce the statues. The editors of A. L. R. recognize the relevancy of each of these classes of cases to the other by including both of them in the annotation in 150 A. L. R. 1214 under the title, "What work of independent contractor or subcontractor is so related to the trade, business, or occupation of

principal employer as to satisfy the condition in that regard of provisions of workmen's compensation or unemployment compensation acts, which make the employer responsible to, or in respect of, employees of the contractor." The *Stratis case* is there again reviewed, at page 1261.

Reverting to workmen's compensation cases, there may be cited the following which involve the principle which we follow in this case although they were not concerned with department stores. *J. E. Ross & Co. v. Collins*, 1932, 224 Ala. 453, 140 So. 764, fixed liability for compensation to an injured employee upon the owner which "leased" its coal mine No. 3 to another upon a royalty basis, retaining supervision and buying the product at an agreed price. Of similar facts and like result is *DeBardeleben Coal Corp. v. Richards*, 1948, 251 Ala. 324, 37 So. (2d) 121.

*Isthmian S. S. Co. of Delaware v. Olivieri*, 5 Cir., 1953, 202 F. (2d) 492, 494, was a case like that at bar in which judgment at law in favor of the injured workman against the principal was reversed. He was the employee of a "Police Service" which contracted to guard defendant's outgoing and incoming cargo. Under a section of the Louisiana Compensation Law, LSA-R.S. 23:1061, which is substantially like our Sec. 72-111, it was held that the guarding of its cargo was a usual part of the "trade, business, or occupation" of a steamship line. It was said that the pertinent cases had settled that, quoting from the opinion, "the compensation statute is to be liberally construed so as to include all services that can reasonably be said to be within the statute not only when the injured person seeks its protection, but when he attempts to have himself excluded from the coverage of the act. The decisive factors are the nature of the employee's work and of the principal's trade, business, or occupation."

The following is quoted from 1 Larson's Workmen's Compensation Law 725, Sec. 49, "Statutory Employees";

"Practically all of the cases of general interest interpreting this type of statute are addressed to one question: when

is the subcontracted work part of the regular business of the statutory employer? The statutory language lying behind this question varies somewhat; some acts speak of work which is 'part of or process in' the employer's trade or business, perhaps excluding, for good measure, work which is 'merely ancillary and incidental' to such trade or business; some use the phrase 'any work which is a part of his trade, business or occupation'; and there are many other variants. But, with a surprising degree of harmony, the cases applying these assorted phrases agree upon the general rule-of-thumb that the statute covers all situations in which work is accomplished which this employer, or employers in a similar business, would ordinarily do through employees."

Professor Larson's digest of the *Stratis case, supra,* is as follows, at the foot of page 729: "And a department store which *merely rented space* to a concessionaire has been held not to be the statutory employer of an employee of the concessionaire." (Emphasis added.) That certainly cannot be said with accuracy of the facts of the instant case.

An interesting tangent consideration is that it has been held that where a customer or patron of a department in a department store is injured because of the negligence of the operator of the department, the proprietor of the department store is held liable therefor, when he has held out to the public that the particular department is a part of his store, regardless of the fact that the department was licensed or leased out to others who actually operated it. *Cornwell v. Leiter Building Stores, Inc.,* 259 Ill. App. 460; *Fields, Inc., v. Evans,* 36 Ohio App. 153, 172 N. E. 702; *Oles v. Kahn Bros.,* 81 Cal. App. 76, 253 P. 158.

For the reasons and upon the authorities which have been set forth the judgment under appeal should be, and it is,

Reversed.

TAYLOR, OXNER and Moss, JJ., and E. H. HENDERSON, Acting Associate Justice, concur.